Moncure, J.
delivered the opinion of the court.
The questions which arise in this case are: First. *736 Whether a court of chancery has jurisdiction of it? Secondly. Whether the slaves in controversy belonged to the estate of Jesse Cornwell instead of to Constance Cornwell, at the time of her death ? Thirdly. Whether the claim of the appellee John Cornwell to the said slaves is concluded by the award of 1829, and the award, decree and other proceedings in the suit of Kitty Cornwell against Thomas Nelson, administrator of Jesse and executor of Constance Cornwell and others? And fourthly. Whether it is concluded by the act of limitations, or by acquiescence or laches on the part of the appellee ? Another question was raised in the court below, viz : Whether the appellee, being a free mulatto, was capable of acquiring permanent ownership of the slaves. But no notice having been taken of that question in the petition for the appeal, or the argument in this court, it may be considered as having been abandoned: and was properly so; the act of 15th March' 1832, Sup. Rev. Code, p. 246, having been passed since the death of the testator ; and the law of the state prior to the passage of that act, not having prohibited the acquisition or ownership of slaves by free persons of color.
Proceeding to consider the other questions in the order above stated, let us enquire :
First. Whether a court of chancery has jurisdiction of the case?
Formerly, in England, suits for legacies were generally brought in the ecclesiastical courts. But they are now rarely brought in those courts, on account of their not possessing adequate jurisdiction to afford complete relief in most cases. 2 Rojier on Legacies 1792. From the time of Lord Chancellor Nottingham, if not from an earlier period, courts of equity have exercised concurrent jurisdiction of such suits with the ecclesiastical courts. They now exercise jurisdiction, in many cases in exclusion of those courts: *737 as for instance, where the legacy is to a married woman, or an infant, or involves a trust, or where a discovery of assets is required. In this state, suits for legacies are brought in courts of equity only 5 except in the few cases in which a court of common law has jurisdiction. No suit will lie at common law to recover a legacy, unless the executor has assented thereto. If no such assent has been given, the remedy is exclusively'in the courts of equity. 1 Story’s Equ. Jur. § 591. Since the decision of Decks v. Strutt, 5 T. R. 690, it has been considered as the settled doctrine in England, that no action at law will lie to recover a general legacy; even though there be assets, and the executor expressly promised to pay it. 2 Roper on Legacies 1798; 1 Story’s Equ. Jur. § 591, 592. This doctrine, however, has not been recognized in any case decided by this court; and Tucker P. in Kayser, ex’or, v. Disher, 9 Leigh 357, seemed to be unwilling to admit it in its whole extent. It is well settled in England, that an action at law is maintainable against an executor for a specific legacy, after assent given: and that would no doubt be regarded as sound doctrine in this state; at least, where the executor waives his right to require a refunding bond. But it is laid down in 1 Story’s Equ. Jur. § 593, as very certain, that courts of equity now exercise .jurisdiction in cases of legacies, whether the executor has assented thereto or not. “ The grounds of this jurisdiction (he says) are various. In the first place, the executor is treated as a trustee for the benefit of the legatees; and therefore, as a matter of trust, legacies are within the cognizance of courts of equity, whether the executor lias assented thereto or not. This seems a universal ground for the jurisdiction. In the next place, the jurisdiction is maintainable in all cases where an account or discovery or distribution of the assets is sought, upon general principles.” And “ in the next place, there is in *738 many cases, the want of any adequate or complete remedy in any other court.” I have seen no case in which it was decided that a court of equity has not jurisdiction in a suit for a legacy, brought by the legatee against the executor. The assent of the executor to the legacy may give a right of action at law, but will not take away the right of suit in equity. Until the legacy is paid or delivered by the executor to the legatee, the former’s trust is executory, and may be enforced in a court of equity. The executor may retract his assent, if given upon a reasonable ground for considering the assets as sufficient for all demands, but which prove deficient in consequence of unknown debts unexpectedly claimed. 2 Lomax on Ex’ors 132. The legatee cannot be expected to know the state of the assets, and the executor cannot complain that the suit against him is brought in a court in which an account can be taken of the assets; and if found deficient, the legacy may be applied to make up the deficiency. These observations apply with increased force in this state, in which an executor, before he can be compelled to pay or deliver a legacy, has a right to require a refunding bond for his indemnity; unless the legatee pursue the course prescribed by the Code, p. 554, § 32.
An executor may certainly agree to dispense with a refunding bond, and to pay or deliver the legacy to the legatee, or hold it for his benefit; and in the latter case, the legacy -would in effect be paid or delivered to the legatee: the executor holding the subject as his agent, and the possession of the agent being that of the principal. In- such a case the remedy of the principal against his agent would probably be at law, and not in equity. But to create such a case the evidence of intention to waive the right to require a refunding bond should be very clear. An executor may be willing to assent to a legacy, and even to hold *739 it for the benefit of the legatee, and still not -willing to part with the possession of it without a refunding-bond. Assent is generally given, and may be enforced by a court of equity, when all debts known to be in existence are paid. But there may be other debts; and against them, the refunding bond is intended to guard. An intention to waive the right to require such bond will not be inferred from a mere assent to the legacy. The assent, in the absence of clear evidence to the contrary, will be presumed to be on condition that the bond be given.
Applying these principles to this case, it is unnecessary to enquire whether the executor Nelson ever assented to the legacy of the slaves in controversy; as there can be no doubt that he never parted with the possession of them as executor, nor waived his right to require a refunding bond. Upon this ground, therefore, I am of opinion that a court of chancery has jurisdiction of the case. Whether it has jurisdiction upon any of the other grounds relied on in the bill, is a question which need not be considered.
Secondly. Did the said slaves belong to the estate of Jesse Cornwell, instead of to Constance Cornwell, at the time of her death?
The appellant contends that she sold Juba, who belonged to the estate of her husband Jesse Cornwell, and bought Prudence or Prucy with the proceeds; intending to substitute the latter in place of the former: and that whether she so intended or not, the legatees in remainder of Jesse Cornwell had a right to claim Prudence and her issue as having been acquired by means of a trust fund to which they were entitled: or at all events, that these slaves were liable for the debt due by the testatrix for the proceeds of the sale of Juba.
If the case be considered without reference to the record of the suit before mentioned, and the deposi *740 tions copied therein, there can be no doubt as to the testatrix to the slaves at the time of her death, nor as to the right of the appellee to claim them as legatee under her will, free from any claim of the legatees in remainder of her husband. The evidence shows that she bought Prudence when a little girl, shortly after her husband’s death in 1805, about four years before the sale of Juba, at the price of two hundred dollars, which she paid out of her own money: that she always claimed, and was reputed, to be the absolute owner of Prudence and her children until her death in 1825, when she bequeathed them to her grandson, the appellee: that they were inventoried and appraised as part of her estate shortly after her death: and that they were always held and claimed by her executor Nelson as part of her estate until his own death in 1845. Besides the record and depositions aforesaid, there is nothing in the case to oppose this strong evidence of title, except some evidence introduced by the appellant to impeach the credit of some of the witnesses of the appellee. Conceding the impeachment to be successful, as far as it goes, the testimony remaining unimpeached is amply sufficient to sustain the title of the testatrix and the claim of the appellee.
In regard to the additional evidence afforded by the record and depositions in the suit aforesaid : I think it is at least questionable whether the appellee ought not to have been a party to that suit; and not having been so, whether the record and proceedings therein are admissible evidence against him. I also incline to think that even if the record be admissible, the depositions copied therein are not properly a part thereof. They all appear to have been taken by the commissioner and returned with his report which was recommitted; and before another report was made, there was an order of reference in the suit, an award, and *741 a final decree thereon. The decree recites that the cause came on to be heard on the bills, answers, exhibits and award; saying nothing of the commissioner’s report and depositions; which seem therefore to be no part of the record, according to the case of Shumate v. Dunbar, 6 Munf. 430. But without expressing any definitive opinion upon these questions, and considering the said record and depositions as admissible evidence, I am still of opinion that it does not alter the ease; and that upon all the evidence therein the testatrix was clearly entitled to the slaves at the time of her death.
It is contended, however, that if she was entitled' to the slaves they were at least liable for the proceeds of the sale of Juba, as a debt due by her at the time of her death. If any such debt ever existed, it has, I think, been fully satisfied. Though entitled to a life estate in all the property of her husband, and though she survived him twenty years, she appears long before her death to have made large advances of slaves and other property to most of her children. As early as 1810, fifteen years before her death, she had made advances to one of them, Lydia Hoff, in full of her interest in the estate. She was one of the four distributees of her deceased son Gustavos, who, besides his own share of the estate, claimed to have purchased the share of his sister Haney Brockley ; on account of which two shares, nothing had been advanced. She left some other estate, besides the slaves in controversy and her interest as distributee aforesaid, which came to the hands of her executor Helson, and on account of which a balance of two hundred and thirty-eight dollars and seventy-three cents was found to be due by him on the settlement of his administration in 1836. The legatees in remainder have received the benefit of that balance, and of her interest as distributee of her deceased son; which, saying nothing of the *742 benefits received in the way of advancements, must ^lave mu°h more than satisfied and compensated any claim they could have against her on account of the price of Juba. But in fact no suit was ever brought. recover any such claim; and if one were now brought, the act of limitations or lapse of time would be a sufficient defense against it.
Thirdly. Is the claim of the appellee concluded by the- award of 1829, and the award, decree and other proceedings in the suit aforesaid ?
I do not understand it to be now contended that the award of 1829 is conclusive; or that it can have any effect upon the case. Neither-the appellee, nor Nelson the administrator of Jesse and executor of Constance Cornwell, was a party to the submission. The award was void, even for matter appearing upon its face; was not acted upon or executed by any of the parties; was expressly repudiated by some of them; and was claimed to be enforced by none of them, except Kitty Cornwell, who attempted to set it up in her suit brought in 1835. It may therefore be dismissed from further consideration.
Then, as to the effect of the award, decree and other proceedings in the suit aforesaid: In the argument of this case, the question was raised and discussed, Whether the slaves in controversy were disposed of, or intended to be disposed of by that award and decree ? The counsel for the appellant maintained the affirmative, and the counsel for the appellee the negative, of this question. The award itself has been lost; and the decree is merely for certain sums of money in pursuance of the award. The contents of the award can only be conjectured, or inferred from the pleadings and proofs in the suit. The slaves are not expressly named in the bill; the main object of which was to recover the slaves Betsy and her children claimed to have been advanced to the complain *743 ant by her mother, and adjudged to be hers in the award of 1829; but which had been sold by her sister Mrs. Petty for one thousand five hundred dollars. Another object of the bill was to enjoin a judgment which had been recovered against her on one of her bonds for the hire of the slave Frank belonging to her father’s estate; which slave she secretly sold about the time she filed her bill, and was of the value of eight or ten hundred dollars. But for these objects the suit would probably not have been brought. For the purpose of attaining them, and especially the one first named, she attempted to set up the award of 1829, and to have the estates of Jesse and Constance Cornwell disposed of according thereto. Not with-, standing the invalidity of that award, it was competent for the court, under the prayer for general relief,, (if all proper parties were before it,) to decree an account and distribution of the estates of Jesse and Constance Cornwell; and, for that purpose, to determine to which of the said estates the slaves in controversy belonged. Whether the court did in fact so determine, is the question. The appellee John Corn-well was of all persons the most interested in such a determination; and was certainly a proper, if not a necessary party to the suit, if it involved his title to the slaves in controversy. The fact that he was no party to the submission, is relied on by the executor Nelson as one of the grounds of the invalidity of the award of 1829. Commissioner Macrae, in his report in the suit, says, “ Prucy and her increase cannot, it is, conceived, be brought into controversy, and adjudicated in this cause, whilst John Cornwell to whom they were bequeathed by the will of C. Cornwell de-, ceased is not a party to this suit; whose claim cannot be affected by the litigation of the parties, of whom he is not one; and the plaintiff Kitty Cornwell makes no claim to Prucy and children in her bill, or other *744 wise, except that she has taken some evidence leaning 'khat way-” That after this, the appellee was not a party to the suit, is an important fact to be considered in deciding the question whether the slaves were disposed of by the award and decreej especially since, if they were so disposed of, they were thereby made the property of the executor Nelson himself. The executor is a sufficient representative of the legatees, only when his interest is not adverse to theirs. The small amount of the decree is also relied on by the counsel of the appellee as strongly tending to show that the slaves in controversy could not have been charged to the appellant in the award. There are but two sums decreed in the suit: One, to wit, four hundred and seventy-four dollars and sixty-four cents, with interest on three hundred and fifty-eight dollars and twenty-two cénts from the first October 1843, in favor of Kitty Cornwell against' Nelson; and the other, to wit, three hundred dollars, with interest •from the same day, in favor of Nelson against Caty 'Cornwell or Petty.
The lowest estimate which was put upon the value of these slaves -in 1838, when the commissioner’s report was made, was one thousand seven hundred and twenty dollars. They seem to have increased rapidly in value after that time until 1850, when they were valued at about five thousand dollars. What was their value in 1843 when the award was made, or in 1844, when the decree was made, does not appear, though it probably much exceeded the value in 1838. Setting down the value only at one thousand seven hundred and twenty dollars, and deducting from it six hundred dollars, which is the highest estimate made of the expense of keeping the slaves over and above their hires while they were in the hands of Nelson prior to 1S38, a balance would remain of one thousand one hundred dollars, which is the lowest sum with *745 which it is contended he was charged for the slaves. It is difficult to understand how he could have been charged even with this small sum, consistently with the small amount of the decree against him. It is not pretended that he paid anything on account of these slaves to Lydia Hoff or Nancy Brockley, as to whom the bill was dismissed. He says in his answer that in 1830 and 1833 he settled with these parties for their shares of both estates, and held their acquittances; and the fact is confirmed by the commissioner’s report and the failure of these parties to assert any claim. In the same answer, filed in 1837, he affirms the continuing title of the appellee to the slaves in controversy, which is inconsistent with the idea that he had previously accounted with Lydia Hoff or Nancy Brockley, or any of the -other legatees in remainder, for any part of the value of the slaves in controversy. Therefore, he could have accounted only with Kitty Cornwell, and perhaps Caty Petty, if with any of the said legatees, and with them only by means of the award and decree aforesaid. And yet the amount decreed against him is little if any more than he seems from the materials in the record to have owed, independently of any charge on account of the slaves. On the other hand, one of the arbitrators, Mr. Tebbs, whose deposition was taken five years after the award was made, testifies that the purpose of the award was to settle the claims in dispute between the heirs of Jesse and Constance Cornwell and Nelson the administrator. “The arbitrators took into their estimate and settlement all the negroes of said decedents’ estates. About these there was much difficulty. Some had been sold: Perhaps all of them. Some were claimed by one party, and the same by another. There had been one or two valuations of the negroes. I recollect negro Pru and her children had been valued, and there was much evidence taken as to the *746 value of them. So it was, the arbitrators took the whole of the negroes into their calculations and estimates with the other property of the estate, and made their award accordingly; aiming at a final settlement of affairs betweeñ the personal representative and the distributees of said decedent.” He does not say what disposition the award'made of Prucy and her children; whether it left them in the hands of Nelson, as executor of Constance Cornwell, or agent of the. appellee; or whether it converted them into the individual property of Nelson, and chai-ged him in some way and to some extent with their value. Either of such dispositions would be consistent with his testimony; though the latter would have been very irregular if not illegal, and difficult to be reconciled with the amount of the decree. The deposition of the other arbitrator, P. D. Richardson, was not taken, and the inference is that he could give no information on the subject. The only other testimony in the case which can tend to show that the claim of the appellee was intended to be concluded or affected by the award, is the deposition of his mother Kitty Cornwell, who says, the arbitrators in their award, at her instance, introduced Prucy and her children, as she believes.
This evidence of the contents of the last award is altogether too vague to conclude and defeat the claim of the appellee; and I think the Circuit court was right in the opinion that “ the slaves were left unaffected ¿and undisturbed by the said decree, in the hands of Thomas Nelson the executor, who held the same until his death.”
I also think the Circuit court was right in the opinion that, even if the award and decree were as contended for by the appellant, “ they were produced as the consequence of an improvident submission to arbitration of the interests which the said Nelson was holding as executor of Constance Cornwell *747 and agent of the legatee; he the said Nelson holding as executor a title in the slaves, shown to have been incontrovertible, and free from all question, in law or in equity; and which ought not, therefore, to have been submitted to arbitrators, to be decided upon according to their vague and undefined and uncontrollable notions of law and equitythat such submission was a devastavit in the executor, for which he was answerable to the legatee, if thereby the slaves were lost to the latter. And “that as the result of the said award and consequent decree has been to leave the slaves in question in the undisturbed possession of the said Nelson, who it is contended became the entire owner absolutely of the same, the legatee is not deprived of his recourse upon them, notwithstanding the award 'made under such improvident and wrongful submission.”
It is stated in the petition for the appeal, that this case is believed to be the first instance in which an executor, acting bona fide, has been held responsible for an award under a submission made by him. And it was argued by the counsel for the appellant, that so unreasonable a doctrine ought not to be sustained.
It would be difficult to maintain that the executor acted bona fide in this case in making the submission, if the award was in pursuance thereof, and the effect of it would be to conclude the claim of the appellee to the slaves, and invest the executor individually with the absolute ownership thereof. The circumstances under which the submission was made have been already sufficiently stated.
But is it true that an executor or administrator will be responsible for a devastavit in no case in which he acts bona fide in making the submission ? In a case decided in 15 Elizabeth, and reported in 3 Leonard 53, it was held that an executor may as ■ such submit to arbitration. But if the arbitrators do not award as *748 much as he would be entitled to at law, it will be a devastavit for the residue; for the submission was his own act. The principle declared in that early case has been recognized in many subsequent cases, and denied in none that I have ever seen. It is stated as the settled doctrine in all the digests and abridgments of the law, and in all the elementary works on the subject. Corny. Dig. Administration, I 1, Assets, C; Viner’s Abr. Executors, 6 a 3; 1 Bacon’s Abr. 314, Arbitrament and Award, C; 1 Dana’s Abr. C, 13, Art. 2; Russell on Arbitration, p. 36, 63 Law Library 84; 1 Lomax on Ex’ors 356. The doctrine was expressly admitted by two of the judges of this court in Wheatley v. Martin's adm'r, 6 Leigh 62. And in the opinion of Judge Cabell in that case, is contained a clear summary of the law in regard to the powers and responsibilities of executors and administrators in this respect. While the power of an executor or administrator to refer to arbitration, results from his power to settle all claims due to or from the estate he represents ; and while the award is binding on him in his fiduciary character, and so far as relates to debtors and creditors, parties to the award, is binding on legatees and distributees in the same manner as if the settlement had been made by him without an award; yet if injury has been done to legatees and distributees by the award, it may be redressed by charging it as a devastavit by him, on the settlement of his accounts. Id. p. 71. The burden of proving such injury would of course devolve on the party complaining of it, and every fair presumption would be made in favor of the award. This doctrine has been altered by the Code, p. 611, § 5; which, however, does not apply to this case.
The reason assigned for the doctrine in the case in Leonard, was that the submission was the executor’s own act. While he has the power to submit, as a *749 means of settlement, lie is not bound to do so; and the award, therefore, before the law was altered 'by the Code, gave him no more protection against the consequence of paying an unjust claim than his voluntary settlement would have done. An award in pursuance of a submission, if there be no error apparent on its face, and in the absence of fraud or mistake, is conclusive. However incompetent the arbitrators may be, and however grossly they may err in their judgment of the law or fact, there can be no appeal from their decision. It may have been considered unsafe and dangerous to permit an executor or administrator to refer to the final arbitrament of such judges a controversy affecting the estate of his decedent, without holding him liable for a devastavit if any injury resulted to the estate from the award. But whether the doctrine was reasonable or not, and what were the reasons on which it was founded, are immaterial enquiries, if I am right in saying that it was well settled.
The result of its application to this case is that the appellee is entitled to recover the slaves in controversy, notwithstanding the award, if he has shown that he would have been so entitled if no such award had been made; and that he has so shown, I think sufficiently appears from what has already been said. The award and decree thereon may, therefore, be put out of the case, and the only remaining question is :
Fourthly. Whether the claim of the appellee is con-' eluded by the act of limitations ; or by acquiesence or laches on his part.
The claim is certainly not barred by the act of limitations. The executor never held the slaves adversely to the appellee, at least before the decree of 1844, and this suit was brought in 1847. Nor is it concluded by acquiesence or laches on his part. He left the state in 1828, two years before he arrived at age, and was not heard of for many years thereafter. It does not ap *750 pear where he was until 1839, since which time he has resided in Georgetown, D. C.- It does not appear that he was ever informed by the executor Nelson, or any other person, or had any knowledge of the 'pendency of Kitty Cornwell’s suit, or of any of the proceedings therein. She says that at the time the suit was brought, she believed that he was dead, or had gone where she would never see or hear from him again. Her interest in regard to the slaves was adverse to his. She was interested in setting up and enforcing the award of 1829, which declared Betsy and her increase to be hers, and the slaves in controversy to be a part of her father’s estate, of which she was one of the distributees. It is true' that before he left the state the executor seems to have accounted with him for the horse bequeathed to him by the testatrix-; and he was doubtless aware of the legacy of the slaves. But by the terms of the will the slaves were not to be delivered to him by the executor until he was of age; and if he attempted to sell them, they were to be free. Whether the latter condition was valid or not, he probably believed it to be so, and the effect was the same. They were chargeable slaves, incapable, it seems, of producing any hire; and they were in the care of one whose relation to them gave assurance that they would not be neglected. It may have been inconvenient or illegal to remove them to his place of residence. Under these circumstances, it was natural and reasonable that he should permit them to remain in the possession of the executor. His having done so from the time of his arrival at age in 1830, until the institution of his suit in 1847, a period of seventeen years, is not of itself sufficient evidence of acquiescence, or'sufficient laches, to conclude his claim, and entitle the executor to the slaves in his own right. The evidence against him afforded by the lapse of time, is repelled, and not. strengthened, by the surrounding circumstances. *751 There is no evidence that the executor ever held, or claimed to hold, the slaves adversely, unless it can be found in the award and decree of 1843 and 1844, the effect' of which has been fully considered. On the contrary, he continued to affirm that he held them as executor of Constance Cornwell, or as agent of the appellee, down to a recent period before his death.
I think there is no error in the decree, and that it ought to be affirmed.
Daniel, J. dissented on the last ground stated in the opinion of the court. He thought the appellee was barred by his laches.
Decree affirmed.